**BERRY BROTHERS BUICK, INC.**

v.

**GENERAL MOTORS CORPORATION (BUICK MOTOR DIVISION).**

Civ. A. No. 32261.

United States District Court
E. D. Pennsylvania.

Aug. 18, 1966.

Isadore H. Bellis, Bellis & Kolsby, Philadelphia, Pa., for plaintiff.

W. Bradley Ward, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for defendant.

## OPINION

WOOD, District Judge.

This is a motion for summary judgment brought by General Motors Corporation (Buick Motor Division) (Buick) in an action to recover damages for allegedly failing to act in good faith toward Berry Brothers Buick, Inc., in not renewing its franchise.[1] The complaint is based on the Automobile Dealers Suit Against Manufacturers Act, 15 U.S.C.A. §§ 1221–1225.[2]

Arthur Berry and Archie W. Berry, twin brothers, were at all times together with their families co-principals in ownership of plaintiff. They were franchised Buick dealers from 1937 to 1960 first as a partnership, then as a corporation. Arthur was President, Archie was Vice-President and Treasurer and the brothers and wives were directors of the corporation. The dealership consisted of at least a large showroom, a service station, a used car lot, a parking lot and about 96,000 square feet of land.

Berry Brothers operated the dealership from 1956 to 1960 under a contract dated March 1, 1956 for a stated term which expired October 31, 1960.

The agreement provided that it would automatically terminate without notice or action on the part of either party at the end of the stipulated term. No specific obligation was imposed on either party to renew the contract after October 31, 1960.

---

1. Summary judgment in cases of this type is not unusual. See, for example, General Motors Corp. v. MAC Co., 247 F. Supp. 723 (D.Colo.1965). Cf. Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645 (3rd Cir. 1964) where judgment n. o. v. was entered for defendant.

2. "An automobile dealer may bring suit against any automobile manufacturer engaged in commerce * * * and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer * * * to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith." 15 U.S.C.A. § 1222.
"(e) The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party; *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C.A. § 1221(e).

Dealer's obligation was "to actively, aggressively and honestly promote the sale of the motor vehicles * · * * to customers in its trade territory" and further "to develop properly the sale thereof at retail particularly in the following area," which embraced the metropolitan area of Philadelphia. The contract was a personal one and was entered "into in reliance upon and in consideration of the personal qualifications" of Arthur and Archie W. Berry, who "actively and substantially participate in the ownership or in the operations or both * * * of the Dealer."

Arthur Berry had full responsibility for the daily operation of the dealership and made all of the business decisions. Archie had severed his connections with Berry Buick many years before 1959. Archie complained about the loss of money to Arthur who failed to satisfy him by better performance.

Arthur regarded the Buick automobile as the reason for his poor sales and was openly contemptuous of their selling ability. There was much validity to his assessment in that Buick registrations in the Philadelphia metropolitan area fell from 12,378 in 1956 to 2,517 in 1959. Arthur complained also of the poor neighborhood in which the shop was located and the ill-fortune of the dealership in not attracting automobile traffic.

The dealer does not complain of Buick's failure to perform its part of the agreement fairly or promptly or of any limitations imposed on its sales of products other than Buick's. Berry in fact sold Ideal outboard boats, Opel automobiles and used cars taken in trade by his brother Lawrence who operated a Volvo dealership. Nor does Berry Brothers allege that it was compelled to buy or pay for automobiles or for parts which it did not need for its customers.

Charles Thieleman was Buick's Philadelphia zone manager who is alleged by Arthur Berry to be the entire cause for the non-renewal. The depositions indicate he was at least an aggressive backer of Buick's products and most likely a stern and hard man who had little regard for the personalities at Berry Brothers. Plaintiff contends that Thieleman was looking for a scapegoat for Buick's losses and chose it. Another motive imputed to Thieleman's action was that he was highly favorable to other Buick dealers competitive with Berry Brothers. The zone manager has been termed as one who "had it out for [Arthur]" and one who was "arrogant and abrupt in his mannerisms."

Buick on several occasions communicated with the dealership and recommended changes in its sales program. On May 9, 1960, Arthur and Archie were notified at a meeting with Mr. Kemp and Mr. Thieleman of Buick's dissatisfaction with their performance and of its decision not to renew the franchise. Buick formally notified plaintiff by letter dated June 3, 1960. The reasons given were esssentially that Archie was no longer an active member of the dealership and that Arthur has been unable and unwilling to provide the type of management required for the operation of a quality Buick dealership. Arthur was deemed unco-operative and unwilling to listen to Buick's many suggestions to obtain for plaintiff the type of market penetration which Buick products deserve. Buick's representatives also showed figures demonstrating the downward trend of Buick sales obtained by plaintiff in Philadelphia. The percentage of the metropolitan potential of plaintiff's sales had fallen from 9.7% in 1955 to 7.2% in 1956–1958 to 5.3% in 1959. Buick further stated it saw nothing to indicate any improvement in the dealership.

On a motion for summary judgment all inferences must be drawn in favor of the non-movant. However, he cannot withhold his evidence until the date of trial but must show by some admissible evidence that there is a genuine issue as to a material fact. Plaintiff cannot rest on an ignorance of the facts but must obtain from discovery or otherwise information which he should seek to amplify or test by further discovery.

Robin Construction Company v. United States, 345 F.2d 610 (3rd Cir. 1965).

■ The Automobile Dealers' Act was intended to "supplement the antitrust laws * * * in order to balance the power now heavily weighted in favor of *automobile manufacturers* * * *" 70 Stat. 1125 (1956). Coercive conduct must be interpreted in the light of the Preamble's purpose and of the difficulties which dealers had in court attempting to enforce the prior antitrust laws. Kessler, Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale L.J. 1135, 1166 & n. 202.

■ An indispensable element of the statutory cause of action is not the lack of good faith in the ordinary sense but a lack of good faith in which "coercion, intimidation or threats" thereof are at least implicit. Dealer has the burden of showing that it was a wrongful termination or non-renewal of the franchise. Milos v. Ford Motor Company, 317 F.2d 712, 718 (3rd Cir. 1963). The manufacturer has no obligation to continue the franchise of an inefficient or undesirable dealer. Garvin v. American Motor Sales Corp., 318 F.2d 518 (3rd Cir. 1963).

■■ Dealers absent coercion are not protected against "arbitrary" refusals to renew. If the manufacturer simply does not renew after failure to communicate in any way with the dealer but after properly fulfilling its part of the agreement, it cannot be liable for failing to act in good faith as defined by the Act. Kessler & Stern, Competition, Contract, and Vertical Integration, 69 Yale L.J. 1, 109, fn. 489.

■ In fact, a disenfranchised dealer does not make a case under the statute merely by proving that his performance was not below minimum standards. Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 443 (1st Cir. 1966).

■ Coercion or intimidation or threat thereof in the context of the Act must include at least two elements, a wrongful demand which will result in sanctions if not complied with. Non-renewal of a franchise is of course a severe sanction, and threatening such because of failure to follow through on a wrongful demand is sufficient to justify recovery. Conditions directly benefiting the manufacturer without a concomitant benefit to dealer are suspect under the provision of good faith. Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437 (1st Cir. 1966).

■ Clear examples of coercion would include manufacturer pressure upon a dealer to accept automobiles or parts which the dealer does not need or want. However, this would still not per se be a violation unless the demand made on the dealer was an unreasonable one since the manufacturer could goad along an inefficient dealer, under the proviso of the Act.

The coercion or threats must be the determining factor in the failure to renew or at least there must be some substantial connection between non-renewal and the illegal conduct.

The middle ground is between freezing the channels of distribution and allowing the manufacturer absolute power to do as he pleases. Coercion must be construed in light of this position.

■ Berry Brothers contends primarily that the reasons given for termination were not substantiated by the facts and that the failure to renew was an arbitrary act on Buick's part. This arbitrariness, it points out, should be construed as conduct amounting to coercion or intimidation. This argument is without merit. The actual notice given to plaintiff of non-renewal was non-coercive and completely divorced from threats since Buick made no demand on plaintiff, unreasonable or otherwise. The term "good faith" is not liberally construed and is confined to the context of coercion and intimidation. Globe Motors, Inc. v. Studebaker-Packard Corp., 328 F.2d 645, 647 (3rd Cir. 1964). Arbitrary non-renewal per se is not sufficient ground for recovery. An efficient dealer has no right to a "marriage for life" with the manufacturer.

Cf. Staten Island Motors, Inc. v. American Motors Sales Corp., 169 F.Supp. 378 (D.N.J.1959). See Comment, The Automobile Dealer Franchise Act of 1956—An Evaluation, 48 Cornell L.Q. 711, 723 (1963).

Therefore, in order to prove its case, plaintiff must show some unfair or inequitable conduct which was of such a nature as to coerce or intimidate it or subject it to threats of severe sanctions. Dealer herein after its major point relies on the conduct of Mr. Thieleman to support its cause of action.

Plaintiff first complains of Mr. Thieleman's unwarranted actions in submitting memos to defendant commenting unfavorably on certain practices and attitudes of the owners of the dealership and its employees. It argues, that since these memos spoke largely of trivial matters such as eating lunch in the showroom and were false in some respects, this must be regarded as coercive conduct. The memos are irrelevant to this cause of action. They were never communicated or shown to the officers of plaintiff and, although possibly unfair, were not designed to coerce, intimidate or threaten them. There was obviously no resistance of any pressure at all by the dealership as to these memos.

Berry Brothers next alleges a lack of good faith in Thieleman's general indifference to plaintiff's employees. Again, plaintiff does not show us how this amounted to "bad faith." How defendant was being coercive or threatening to Berry Buick in ignoring the employees is not apparent.

Finally, Berry Brothers contend that Thieleman requested that Arthur Berry fire long-term competent and successful employees such as Kaiserman and Coupe. It does not seem that non-renewal had anything to do with that problem assuming it existed. Moreover, if it did, it was merely a recommendation on Buick's part as to increasing sales. Buick had nothing to gain by Thieleman's remarks except increased sales which would certainly have helped Berry Brothers. Moreover, Arthur on occasion had requested Buick to procure different or better salesmen for him.

Archie's statement that Buick acted unfairly in not giving the dealership an opportunity to recoup its losses does not preclude summary judgment. This was not legally or factually the unfairness legislated against in the Act. There was no implicit coercion, intimidation or threats thereof in this alleged unfair conduct.

Since plaintiff has produced no facts from which a jury could conclude that Buick had not acted in good faith in failing to renew the franchise, the motion for summary judgment must be granted.